**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ATHENA GOETTER, *et al.*,<br><br>   Plaintiffs,<br><br>  v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services,<br><br>   Defendant. | Civil Action No. 25-3100 (CKK) |

**MEMORANDUM OPINION**
(August 5, 2026)

This case is about the amount that Medicare must pay to reimburse suppliers of Relizorb (styled "RELiZORB"), a therapeutic device that helps patients with cystic fibrosis and other serious pancreatic conditions digest and absorb essential fats. This case is one of several related matters arising from a long-running reimbursement dispute between Relizorb's manufacturer and the Center for Medicare and Medicaid Services. In this case, Relizorb's manufacturer and three individual Medicare beneficiaries challenge three decisions of the Medicare Appeals Council in which the Council denied requests for greater reimbursement payments for the device. The Secretary of Health and Human Services opposes the Plaintiffs' challenges and argues that the record supports the Council's decisions. The parties have filed motions for summary judgment, which are ripe for decision. Upon consideration of the parties' submissions,[1] the relevant legal

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:
- The Defendant's Supplemental Memorandum in Support of its Motion for Summary Judgment ("Def.'s Mem."), Dkt. No. 12, which incorporates by reference the Defendant's Memorandum in Support of its Motion for Summary Judgment in the related case of *Henry v. Kennedy* ("*Henry II*"), Case No. 21-cv-0747, *available at* Dkt. No. 17-1 in Case No. 21-cv-0747;
- The Plaintiffs' Supplemental Memorandum in Support of their Motion for Summary Judgment ("Pls.' Mem."), Dkt. No. 14, which incorporates by reference the Memorandum in Support of the Plaintiffs' Motion

authority, and the entire record, the Court concludes that the Council's decisions were consistent with the relevant legal standards, were supported by substantial evidence, and were not arbitrary and capricious.  Accordingly, the Court shall **GRANT** the Defendant's [12] Motion for Summary Judgment and **DENY** the Plaintiffs' [13] Motion for Summary Judgment.

## I. BACKGROUND

### A. Factual Background

Relizorb is a therapeutic device that helps patients with cystic fibrosis and other serious pancreatic conditions digest and absorb essential fats.  *See* Compl. ¶¶ 40–43; J.A. vol. 1 at 51.  Relizorb is available by prescription in boxes of single-use units called cartridges.  *See* Compl. ¶ 42; J.A. vol. 1 at 51, 179–80.  Each cartridge contains digestive enzymes and connects to a supply of enteral nutrition—that is, nutrition delivered by tube feeding directly into the gastrointestinal tract—to help the patient absorb necessary nutrients.  *See* Compl. ¶ 42; J.A. vol. 1 at 51.

The three individual Plaintiffs in this action are Medicare beneficiaries with complex illnesses who have received Relizorb to help address nutritional deficits.  Compl. ¶¶ 8–10.  Relizorb's developer and sole manufacturer, Alcresta Therapeutics, Inc., is also a Plaintiff.  *Id.* ¶¶ 11, 40.

The FDA cleared Relizorb for prescription use by adults in November 2015.  Compl. ¶ 44.  To understand the multifaceted reimbursement litigation that ensued, it is necessary first to understand the sprawling statutory and regulatory framework that governs Medicare payments for products like Relizorb.  The Court describes that framework in the next section.

---

for Summary Judgment and the Plaintiffs' Reply in *Henry II*, *available at* Dkt. Nos. 13-1 and 13-2 in Case No. 25-cv-3100 (this case) *and* Dkt. Nos. 9 and 18 in Case No. 21-cv-0747; and

- The Joint Appendix ("J.A."), Dkt. No. 16 (cited by volume: "J.A. vol. 1" appears at Dkt. No. 16-1, "J.A. vol. 2" appears at Dkt. No. 16-2, and "J.A. vol. 3" appears at Dkt. No. 16-3).

In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court.  *See* LCvR 7(f).

### B.  Statutory and Regulatory Framework

#### 1.     The Medicare Program

The Medicare program provides health insurance coverage for Americans who are elderly or living with certain disabilities.  *See* 42 U.S.C. § 1395 *et seq.*  The Center for Medicare and Medicaid Service ("CMS") within the Department of Health and Human Services ("HHS") administers Medicare on behalf of the Secretary of Health and Human Services.  *See id.* § 1395kk; 42 C.F.R. § 400.200.  Congress has provided that many aspects of the Medicare program, including several that are at issue in this case, must be administered through contracts with private firms called Medicare Administrative Contractors ("MACs").  *See* 42 U.S.C. § 1395u(a).

Health coverage under the Medicare program is divided into four parts: A, B, C, and D. *See* 42 U.S.C. §§ 1395c–1395w-154.  Only Part B is at issue in this case.  *See id.* §§ 1395j–1395w-6.  Part B provides coverage for a variety of outpatient medical treatments, including many kinds of supplies and medical devices used outside the context of hospital care.  *See id.* § 1395k.

#### 2.     Medicare Coverage and Reimbursement for Enteral Nutrition Products

As part of Medicare Part B's coverage for outpatient treatments, the program provides payment for a variety of products that are "reasonable and necessary for the diagnosis or treatment of illness or injury."[2]  This framework covers products like Relizorb that beneficiaries use in

---

[2] *See* 42 U.S.C. §§ 1395k(a)(2)(B) (providing that Part B covers "medical and other health services"), 1395k(a)(2)(I) (providing that Part B covers "prosthetic devices"), 1395y(a)(1)(A) (excluding payment for items and services that are not "reasonable and necessary").

connection with parenteral and enteral nutrition.[3]  Medicare Part B reimburses suppliers for 80

percent of the allowed payment amount for these products.[4]

When a Medicare beneficiary receives a covered product like Relizorb, the supplier of the

product generally submits a claim to one of CMS's regional contractors, which decides whether

the product is covered and, if so, how much to pay the supplier.[5]   To make this decision, which

CMS calls the "initial determination," the contractor applies the Medicare statute and applicable

regulations and guidance published by CMS.[6]  The supplier has the burden of providing "such

information as may be necessary in order to determine the amounts due" as payment.[7]

To help standardize decisions about coverage and reimbursement, CMS assigns unique

codes to medical products and supplies through a system called the Healthcare Common Procedure

---

[3] See 42 C.F.R. § 414.102(a) (providing for the payment of claims "[f]or [parenteral and enteral nutrition] items and services furnished on or after January 1, 2002"); Medicare Benefit Policy Manual, CMS Pub. No. 100-02, ch. 15, § 120.A (rev. Oct. 1, 2003) (providing that "[a]ccessories and/or supplies which are used directly with an enteral or parenteral device may . . . be covered under the prosthetic device benefit," subject to other guidelines); Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 20, § 10 (rev. Dec. 20, 2019, June 11, 2021, and May 12, 2022) (providing that "[p]arenteral and enteral nutrition, and related accessories and supplies, are covered under the Medicare program as a prosthetic device").

[4] See 42 C.F.R. § 414.102(a) (providing that payment is made "on the basis of 80 percent of the lesser of" the "actual charge for the item or service" and the "fee schedule amount" set for the item or service).

[5] See 42 U.S.C. §§ 1395u(a) (providing that Part B is administered through contracts), 1395kk-1(a)(4)(A)–(B) (providing that the functions of contractors include determining payment amounts and making payments); 42 C.F.R. §§ 405.924(b) (providing that the contractor "makes initial determinations regarding claims for benefits under Medicare . . . Part B," which includes deciding whether "the items and/or services furnished are covered" and resolving "[a]ny other issues having a present or potential effect on the amount of benefits to be paid under . . . Part B of Medicare"), 421.210(b)–(c) (providing that regional contractors process claims for durable medical equipment, prosthetics, orthotics, and supplies); Medicare Claims Processing Manual, ch. 20, § 10 (rev. Dec. 20, 2019, June 11, 2021, and May 12, 2022) (providing that "[p]arenteral and enteral nutrition, and related accessories and supplies" covered under Part B are "billed to the [durable medical equipment] [Medicare Administrative Contractor]").

[6] See 42 C.F.R. §§ 405.904(a)(2) (providing that a contractor "makes an initial determination when a claim for Medicare benefits under Part A or Part B is submitted"), 405.924(b) (similar); see also id. §§ 405.1060(a)(4) (providing that a national coverage determination "is binding" on contractors), 405.1063 (providing that "[a]ll laws and regulations pertaining to the Medicare and Medicaid programs . . . are binding on" the administrative adjudicators to whom contractors' decisions may be appealed).

[7] 42 U.S.C. § 1395l(e); 42 C.F.R. § 424.5(a)(6) ("The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment.").

Coding System ("HCPCS").[8]  Obtaining an HCPCS code for a new product is important to health care providers and suppliers because it allows them to seek separate reimbursement for the product, rather than having reimbursement bundled with codes for existing products or services.  *See* Compl. ¶ 22.

CMS sometimes decides on a national basis that a particular item (identified by its HCPCS code) is reasonable and necessary for the treatment of a particular illness or injury.  Such a policy, called a "national coverage determination," ("NCD"), applies to all Medicare beneficiaries.  *See* 42 U.S.C. §§ 1395ff(f)(1)(B), 1395y(*l*)(6)(A); 42 C.F.R. § 405.1060(a).  In the absence of a national coverage determination, a Medicare contractor can also exercise its discretion to adopt a "local coverage determination" ("LCD"), which applies to all Medicare beneficiaries within the contractor's jurisdiction.  42 U.S.C. §§ 1395ff(f)(2)(B), 1395y(*l*)(6)(B).  The Medicare statute requires the Secretary to follow certain procedures when adopting NCDs, including providing notice and an opportunity for public comment and publishing of "a clear statement of the basis for the determination."  42 U.S.C. §§ 1395y(a), 1395y(*l*)(1)-(4).  The statute also imposes procedural requirements on contractors adopting LCDs, including a requirement to publish a "summary of evidence" that the contractor considered and "[a]n explanation of the rationale" for its determination at least 45 days before the determination takes effect.  42 U.S.C. § 1395y(*l*)(5).

The Secretary issued an NCD for enteral and parenteral nutritional therapy in 1984. Medicare National Coverage Determination Manual, CMS Pub. No. 100-03, ch. 1, pt. 3, § 180.2 (July 11, 1984).  This NCD provided that the Medicare Part B prosthetic device benefit would

---

[8] *See* 42 U.S.C. § 1320d-2 (directing the Secretary to "adopt standards for transactions, and data elements for such transactions, to enable health information to be exchanged electronically" for "financial and administrative transactions"); 42 C.F.R. § 414.40(a) (providing that "CMS establishes uniform national definitions of services, codes to represent services, and payment modifiers to the codes"), 45 C.F.R. § 162.1002(b)(3), (c)(1) (adopting HCPCS as the code set for use with durable medical equipment, orthotic and prosthetic devices, and medical supplies).

cover enteral nutrition therapy for a patient who "cannot maintain weight and strength commensurate with his or her general condition" because of "chronic illness or trauma" causing an impairment "of long and indefinite duration." *Id.* This coverage determination provided that when the coverage requirements for enteral nutrition were satisfied, Medicare would also cover "related supplies" and "equipment" used in conjunction with enteral feeding. *Id.* (citing Medicare Benefit Policy Manual, CMS Pub. No. 100-02, ch. 15, § 120).

In February 2021, the four regional contractors that process claims for durable medical equipment, prosthetics, orthotics, and medical supplies jointly proposed new LCDs for enteral nutrition products, effectively superseding the 1984 NCD. *See* Proposed Local Coverage Determination: Enteral Nutrition (DL38955), CMS (Feb. 25, 2021), https://perma.cc/86MS-B434. The new joint LCDs were more specific than the prior NCD, providing that "[i]n-line digestive enzyme cartridges" like Relizorb are "reasonable and necessary" for Medicare beneficiaries who meet the coverage criteria for enteral nutrition and "have a diagnosis of Exocrine Pancreatic Insufficiency." *Id.* These LCDs provided for coverage of up to two such cartridges per day for qualifying beneficiaries. *Id.*

Following the adoption of these LCDs, the Secretary rescinded the NCD for enteral nutrition therapy, effective January 1, 2022, determining that "no [NCD] is appropriate at this time." Medicare National Coverage Determinations Manual, CMS Pub. No. 100-03, ch. 1, pt. 3, § 180.1 (rev. May 20, 2022). Accordingly, since January 2022, contractors' LCDs have been controlling for enteral nutrition therapy. *See id.* (noting that "[i]n the absence of an NCD, coverage determinations will be made by the Medicare Administrative Contractors").

CMS uses a fee schedule to decide payment amounts for parenteral and enteral nutrition products covered under an NCD or an LCD. *See* 42 C.F.R. § 414.102(a); *see also* Balanced Budget

Act of 1997, Pub. L. 105-33, 111 Stat. 251, 390, § 4315(s) (1997) (codified at 42 U.S.C. § 1395u(s)) (authorizing adoption of fee schedules for these products). Specifically, Medicare will pay 80 percent of the allowed payment amount, which is "the lesser of" the "actual charge" for the product and the "fee schedule amount" set for that product. *Id.* CMS sets the fee schedule based on the "reasonable charges" for each product in a fixed base year, 1995, adjusted periodically to account for inflation and other factors. *Id.* §§ 414.102(c), 414.104(b). However, if the fee schedule does not include a particular product (for example, if the product is new and was not available in the base year), CMS must use a different approach. *See id.* § 414.112.

For covered products that do not appear in the fee schedule, CMS requires contractors to use a specific "gap-filling" methodology to decide the proper payment amount. This gap-filling methodology appears in the Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3, and in a regulation that the Secretary later adopted through notice-and-comment rulemaking, 42 C.F.R. § 414.112.

The parties in this case dispute exactly what Medicare's gap-filling methodology requires. The relevant regulation provides that when a new HCPCS code describes an item or service without a "fee schedule pricing history" under a prior code, the fee schedule amount for the new code is to be established in one of two ways. 42 C.F.R. § 414.112(a). First, if "items with existing fee schedule amounts are determined to be comparable to the new items," the amount may be established "using existing fee schedule amounts for [those] comparable items." *Id.* § 414.112(b). Second, if there are no comparable items, "fee schedule amounts may be established using supplier price lists, including catalogs and other retail price lists (such as internet retail prices) that provide information on commercial pricing for the item." *Id.* § 414.112(c)(1).

At the times relevant to this case, the Medicare Claims Processing Manual described essentially the same process, requiring the use of existing fee schedules for comparable items, or the use of "other sources of pricing data" if no comparable items were available.[9]  An earlier version of the Manual that is relevant to a related case was somewhat more prescriptive, calling for the use of "supplier price lists with prices in effect during the fee schedule data base year" if no comparable items were available.[10]

The relevant regulation and the relevant versions of the Manual provide that "verifiable information from supplier invoices and non-Medicare payer data" may be used in the gap-filling calculation.[11]  The regulation and the versions of the Manual that are directly relevant to this case also cite "payments made by Medicare Advantage" as a permissible source of pricing information.[12]  Each source further provides that "[i]f the only available price information is from a period other than the [fee schedule] base period," the contractor may use pricing information from a different year, adjusted by a deflation factor.[13]

### 3.    The Medicare Appeals Process

After a Medicare contractor makes an initial determination about the amount of payment that is due for a given item or service provided to a Medicare beneficiary, the supplier or beneficiary may pursue up to four levels of administrative appeals.  42 U.S.C. § 1395ff(a)(3)(A),

---

[9] *See* Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3 (rev. Dec. 4, 2020; Dec. 2, 2021; and Dec. 2, 2022).

[10] *See* Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3 (rev. Sept. 14, 2018).

[11] *See* 42 C.F.R. § 414.122(c)(1); Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3 (rev. Sept. 14, 2018, Dec. 4, 2020; Dec. 2, 2021; and Dec. 2, 2022).

[12] *See* 42 C.F.R. § 414.122(c)(1); Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3 (rev. Dec. 4, 2020; Dec. 2, 2021; and Dec. 2, 2022).

[13] *See* 42 C.F.R. § 414.122(c)(1) ("fee schedule" in original); Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3 (rev. Sept. 14, 2018, Dec. 4, 2020; Dec. 2, 2021; and Dec. 2, 2022).

(c)(3)(B), (d)(1)(A), (d)(2)(A); *see generally* 42 C.F.R. §§ 405.904(a)(2) (describing claim appeals process), 405.906(a)(1)–(2) (providing that both beneficiaries and suppliers are parties to initial determinations), 405.906(b)(1) (providing that the parties to an initial determination may be parties to an appeal).

The first level of appeal is a request for a "redetermination" by the Medicare Administrative Contractor ("MAC") that made the initial determination.  42 U.S.C. § 1395ff(a)(3)(A); 42 C.F.R. §§ 405.904(a)(2), 405.906(b), 405.940–.958.

The second level of appeal is a request for "reconsideration," which is directed to a different Medicare contractor called the "qualified independent contractor" ("QIC").  42 U.S.C. § 1395ff(c); 42 C.F.R. §§ 405.904(a)(2), 405.934, 405.960–.978.

The third level of appeal is a review by an administrative law judge ("ALJ").  42 C.F.R. §§ 405.936, 405.1000–.1058.  The ALJ reviews the initial determination based on a *de novo* review of the administrative record, which may include evidence developed at a hearing.  *Id.* § 405.1000(d).

The fourth and final level of administrative appeal is a review by the Medicare Appeals Council.  42 C.F.R. §§ 405.938, 405.1100–.1140.  The Council reviews the ALJ's decision *de novo*, but it confines its review to the evidence contained in the administrative record that was before the ALJ.  42 C.F.R. §§ 405.1100(c), 405.1122(a)(1).  The Council "may adopt, modify, or reverse" the ALJ's decision.  42 C.F.R. §§ 405.1128(b).

A decision by the Council at the culmination of this four-level process is a final agency determination and is subject to judicial review.  *See* 42 U.S.C. §§ 405(g), 1395ff(b)(1)(A); 42 C.F.R. § 405.1136.  A party may also seek judicial review without exhausting every step of the

administrative appeals process if the administrative reviewers do not issue decisions within certain statutory time limits.  *See* 42 U.S.C. §§ 1395ff(d)(3)(A)–(B); 42 C.F.R. §§ 405.1016(f), 405.1132.

Judicial review proceeds according to the standards of the Administrative Procedure Act ("APA") and is based on the same administrative record that was before the Council and the ALJ. *See* 42 U.S.C. § 405(g); *id.* § 1395ff(b)(1)(A) (providing that judicial review is "as is provided in" § 405(g)).  Upon review of the record, the court may enter "a judgment affirming, modifying, or reversing the decision" under review, "with or without remanding the cause for a rehearing."  *See* 42 U.S.C. §§ 405(g), 1395ff(b)(1)(A).

### C. Alcresta's HCPCS Application and Early Reimbursement Litigation

With this framework in mind, the Court turns to the history of the reimbursement dispute at the heart of this case.

Plaintiff Alcresta, which developed and manufactures Relizorb, requested an HCPCS billing code for the device in December 2015, soon after the FDA cleared the device for use in November 2015.  *See* Compl. ¶ 44.  In its application for an HCPCS code, Alcresta answered a variety of questions about its new product.  *See* Ex. 5 to Pls.' Reply, *Henry v. Becerra*, No. 21-cv-0747-CKK, Dkt. No. 18-2 (D.D.C. June 11, 2021) ("HCPCS Application Ex.").[14]

The information that Alcresta provided in its initial HCPCS application is centrally important to this case.  In response to a question asking for the "Manufacturer's Suggested Retail Price (MSRP) or list price of the item," Alcresta wrote, "The wholesale acquisition cost [WAC] is

---

[14] The parties did not include this application in the Joint Appendix, but it is part of the Administrative Record because it was before the agency at the time that it made its decision. *See* J.A. vol. 1 at 193 (stating that the copy of Alcresta's HCPCS code application previously filed as an exhibit in Case No. 21-cv-0747 was attached as an exhibit to Mr. Mayo's reconsideration request in this case); J.A. vol. 2 at 81 (same, as to Ms. Goetter); J.A. vol. 3 at 90 (same, as to Ms. Muhammad-Solomon); 42 C.F.R. §§ 405.1122(a)(1) (providing that the Council's review is based on "the record of the proceedings before the ALJ"), 405.1000(d) (providing that the ALJ's decision is "based on the administrative record"); *see also Env't Def. Fund, Inc. v. Castle*, 657 F.2d 275, 284 (D.C. Cir. 1981) (explaining that "judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made"); *S. Airways Express, LLC v. United States Dep't of Transportation*, 159 F.4th 50, 58 (D.C. Cir. 2025) (same).

$49/single use Relizorb™ cartridge." HCPCS Application Ex. at 11. Elsewhere in the same application, in response to a question soliciting "3 months of marketing experience" reflecting the "total number of units sold in the U.S. and the total dollar amount in sales," Alcresta answered, "Number of units sold as of 12/08/15 : 600 cartridges," and "Total Sales as of 12/08/15: $29,400.00," implying a sales price of $49 per cartridge. *Id.* at 10–11.

In the spring of 2016, CMS, acting through its HCPCS Workgroup, denied Alcresta's initial request for a unique billing code for Relizorb. Compl. ¶ 44. The HCPCS Workgroup concluded that existing billing codes for enteral feeding supply kits adequately covered Relizorb. *Id.* Alcresta requested reconsideration of this decision, which CMS denied. *Id.*

Alcresta submitted another application for a unique HCPCS code for Relizorb in 2017, which CMS denied for the same reason. Compl. ¶ 45. Alcresta again requested reconsideration, which CMS denied. *Id.*

In early 2018, Alcresta submitted a third application for an HCPCS billing code and— joined by a Medicare beneficiary receiving Relizorb—filed a civil action in this District seeking a preliminary injunction, arguing that CMS was unlawfully denying separate reimbursement for Relizorb by including it in bundled codes for enteral nutrition supply kits. Compl. ¶¶ 47–48; *see Alcresta Therapeutics, Inc. v. Azar* ("*Alcresta I*"), No. 18-cv-0243, 2018 WL 11670883 (D.D.C. June 15, 2018) (TJK).

While Alcresta's application for a preliminary injunction was pending, CMS removed Relizorb from the list of products included in the bundled kit codes in April 2018, and it issued a new temporary code for Relizorb that became effective in July 2018. Compl. ¶¶ 48–49; *see Alcresta Therapeutics, Inc. v. Azar* ("*Alcresta III*"), 755 F. App'x 1, 3 (D.C. Cir. 2018). However, this code was encumbered by two "indicators"—one meaning "not payable" and the other meaning

11

"not separately priced by Part B"—that had the practical effect of ensuring that claims using the new code would not result in separate reimbursement. Compl. ¶ 49; *see Alcresta I*, 2018 WL 11670883, at \*5; *Alcresta III*, 755 F. App'x at 3.

In June 2018, Judge Timothy J. Kelly denied Alcresta's motion for a preliminary injunction, concluding that neither it nor the Medicare beneficiary suing alongside it had shown a sufficient likelihood of irreparable harm to warrant preliminary relief. *Alcresta I*, 2018 WL 11670883, at \*7, \*12. Alcresta then applied to Judge Kelly for an injunction pending appeal, which he denied for the same reason. *Alcresta Therapeutics, Inc. v. Azar* ("*Alcresta II*"), 318 F. Supp. 3d 321, 328 (D.D.C. 2018) (TJK).

On appeal to the D.C. Circuit, Alcresta renewed its application for an injunction pending appeal, which the D.C. Circuit granted in part, ordering the Secretary "to issue a temporary billing code for Relizorb that is not encumbered with the Medicare-coverage indicator, pending further order of the court." Order, *Alcresta Therapeutics, Inc. v. Azar*, No. 18-5192 (D.C. Cir. July 13, 2018) (per curiam).

In response to this interim order, CMS replaced the "not payable" indicator for Relizorb's temporary code with another indicator that also had the practical effect of preventing separate Medicare reimbursement. Compl. ¶ 51. Alcresta then moved to enforce the court's order on the grounds that the assigned code remained essentially unusable, but the D.C. Circuit denied Alcresta's motion on the grounds that—according to CMS's representations—the code would "permit[] claims processing and result[] in an appealable, initial determination." Order, *Alcresta Therapeutics, Inc. v. Azar*, No. 18-5192 (D.C. Cir. July 27, 2018) (per curiam).

Soon afterward, in November 2018, CMS announced a new code for Relizorb that placed it in the same series as other enteral and parenteral nutrition supplies. Compl. ¶ 53; *Alcresta III*,

755 F. App'x at 3.  However, this code initially remained encumbered by the same codes that prevented reimbursement of claims submitted using the temporary code.  *See* Compl. ¶ 53.

In December 2018, the D.C. Circuit granted Alcresta's application for a preliminary injunction and ordered CMS to provide "a separate, usable code for Relizorb unencumbered by Medicare coverage or pricing indicators that bundle it with [a code for enteral nutrition supply kits]."  *Alcresta III*, 755 F. App'x at 6.  Following this decision, CMS modified the indicators for Relizorb's code to reflect that it was approved for Medicare payment at "contractor discretion" in connection with enteral nutrition, and CMS issued a permanent code effective January 1, 2019.  Compl. ¶ 54 (citing *2019 Corrections to the Alpha-Numeric HCPCS File*, CMS, https://perma.cc/N38R-WC5C).

Because Relizorb was a new product without an established price on CMS's national fee schedule for enteral nutrition therapy, CMS sent a letter to its contractors directing them to process claims for Relizorb "in accordance with the gap-filling methodology in section 60.3 of Chapter 23 of the Medicare Claims Processing Manual."  Compl. ¶ 55 (quoting Technical Direction Letter TDL-190132 (Dec. 20, 2018)); *see* J.A. vol. 3 at 40 (same); *see also* J.A. vol. 1 at 33 (similar); J.A. vol. 2 at 34 (similar).

This case is about whether CMS's contractors correctly implemented the gap-filling methodology described in this letter.  It is undisputed that the contractors ultimately calculated the gap-filled payment amount based on the figure of $49 per cartridge that Alcresta had listed in its initial HCPCS application, in response to a question calling for the "Manufacturer's Suggested Retail Price (MSRP) or list price of the item."  *See* HCPCS Application Ex. at 11.  Although this question expressly called for the MSRP, Alcresta indicated in its response that the $49-per-cartridge figure reflected the "wholesale acquisition cost" of Relizorb.  *See id.*  The parties dispute

13

whether it was reasonable for CMS and its contractors to rely on this figure to set the gap-filled payment amount for Relizorb.

### D. Prior Litigation Regarding the Contractors' Gap-Filling Calculation

Before the claims in the present case became ripe for judicial review, Alcresta and a Medicare beneficiary named James Henry sought judicial review of two earlier reimbursement decisions, invoking exceptions to the administrative exhaustion rules that typically require a party to obtain a decision from Medicare Appeals Council before filing a civil action. *See* Compl., *Henry v. Azar* ("*Henry I*"), No. 20-cv-1144 (D.D.C. filed May 1, 2020); Compl., *Henry v. Azar* ("*Henry II*"), No. 21-cv-0747 (D.D.C. filed Mar. 22, 2021). In both cases, Alcresta and Mr. Henry alleged that CMS had misapplied the gap-filling methodology by improperly relying on the $49-per-cartridge figure in its gap-filling calculation. *See* Compl., *Henry I*; Compl., *Henry II*.

This Court dismissed the first case for lack of subject-matter jurisdiction. *See Henry I*, No. 20-cv-1144, Dkt. Nos. 22–23 (D.D.C. Feb. 8, 2021). The second case remains pending and is held in abeyance pending a decision in the present case, which presents substantially similar legal claims on a more fully developed record. *See* Joint Status Report, No. 21-cv-0747, Dkt. No. 34 (D.D.C. June 8, 2026).

### E. Procedural History of the Claims Before the Court

The individual Plaintiffs in this case, Athena Goetter, Nya Muhammad-Solomon, and Shandale Mayo, are Medicare and Medicaid beneficiaries who received supplies of Relizorb to help address nutritional deficiencies related to their complex medical conditions. Compl. ¶¶ 8–10, 37–39. This case relates to one specific date of service for each beneficiary. *See* J.A. vol. 1 at 74 (July 4, 2021, as to Mr. Mayo); J.A. vol. 2 at 93 (January 5, 2022, as to Ms. Goetter); J.A. vol. 3 at 103 (December 30, 2022, as to Ms. Muhammad-Solomon). It is undisputed that treatment with Relizorb was medically necessary for each Plaintiff on the relevant dates. *See* J.A. vol. 1 at 31

14

(ALJ decision stating that medical necessity "is not at issue" as to Mr. Mayo); J.A. vol. 2 at 50 (same, as to Ms. Goetter); J.A. vol. 3 at 37 (same, as to Ms. Muhammad-Solomon).

On the service dates at issue in this case, each Plaintiff received a supply of Relizorb from a Medicare supplier, and the supplier later received reimbursement from a Medicare contractor. *See* J.A. vol. 1 at 74; J.A. vol. 2 at 93; J.A. vol. 3 at 103. Specifically, Ms. Goetter received 30 cartridges from Bioscrip Infusion Services, LLC ("Bioscrip Infusion"), which later received payment of $1,066.32 ($35.54 per cartridge) from Medicare contractor Noridian Healthcare Solutions, LLC-JA (Jurisdiction A) ("Noridian"). J.A. vol. 2 at 93; *see also* Compl. ¶¶ 64–65. Ms. Muhammad-Solomon received 60 cartridges from Option Care Enterprises, Inc. ("Option Care"), which later received $2,089.99 ($34.83 per cartridge) from Noridian. J.A. vol. 3 at 103; *see also* Compl. ¶¶ 73–74. And Mr. Mayo received 30 cartridges from Bioscrip Pharmacy Services, Inc. ("Bioscrip Pharmacy"), which later received payment of $1,014.48 ($33.82 per cartridge) from Medicare contractor CGS Jurisdiction B ("CGS"). J.A. vol. 1 at 74; *see also* Compl. ¶¶ 82–83. Each of these payments reflected a 20 percent coinsurance rate, meaning that Medicare paid 80 percent of the allowed charges and either the patient or another insurer was responsible for the remaining 20 percent. *See* J.A. vol. 1 at 74; J.A. vol. 2 at 93; J.A. vol. 3 at 103.

The payments that the Medicare contractors allowed for these claims were about 90 percent less than the amounts that the suppliers submitted as charges. *See* J.A. vol. 1 at 74; J.A. vol. 2 at 93; J.A. vol. 3 at 103. In Ms. Goetter's case, Bioscrip Infusion submitted a charge of $11,340.00 ($378.00 per cartridge), but Noridian allowed only $1,332.90 ($44.43 per cartridge). J.A. vol. 2 at 93; *see also* Compl. ¶ 64. In Ms. Muhammad-Solomon's case, Option Care submitted a charge of $24,271.20 ($412.02 per cartridge), but Noridian allowed only $2,665.80 ($44.42 per cartridge). J.A. vol. 3 at 103; *see also* Compl. ¶ 73. And in Mr. Mayo's case, Bioscrip Pharmacy submitted

a charge of $11,340 ($378.00 per cartridge), but CGS allowed only $1,268.10 ($42.27 per cartridge). J.A. vol. 1 at 74; *see also* Compl. ¶ 82. In each case, the MAC calculated the allowed payment amount using the $49-per-cartridge figure from Alcresta's HCPCS application, adjusted by the beneficiary's 20 percent coinsurance amount, local sales taxes, and deflation and update factors intended to account for background price changes. *See* J.A. vol. 1 at 4; J.A. vol. 2 at 4; J.A. vol. 3 at 4.

After receiving these decisions, each beneficiary appointed a personal representative to appeal the decisions on their behalf. J.A. vol. 2 at 231; J.A. vol. 3 at 101; *see* J.A. vol. 1. at 61 (cover letter stating that appointment is attached). The beneficiaries' appointed representative then proceeded on their behalf through the four-step administrative appeals process.[15] In their administrative appeals, the beneficiaries argued that the proper starting point for the gap-filling calculation should have been the supplier's actual charges submitted for the dates of service in question, not the dramatically lower $49-per-cartridge figure drawn from Alcresta's HCPCS application. *See* J.A. vol. 1 at 205; J.A. vol. 2 at 221; J.A. vol. 3 at 213–14.

At the culmination of the administrative appeals process, the Medicare Appeals Council affirmed the initial payment decisions in each case, concluding that no additional Medicare Part B reimbursement should be allowed. J.A. vol. 1 at 11; J.A. vol. 2 at 11; J.A. vol. 3 at 12.

The Council provided materially identical explanations for its decisions rejecting each of the three beneficiaries' requests for additional payment. *See* J.A. vol. 1 at 3–11; J.A. vol. 2 at 3–

---

[15] *See* J.A. vol. 1 at 62 (requesting redetermination), 64–66 (unfavorable decision on redetermination), 175 (requesting reconsideration), 13 (stating that the decision on reconsideration was unfavorable), 213–14 (requesting ALJ review), 30–36 (unfavorable ALJ decision), 22 (requesting Council review), 3–11 (unfavorable Council decision); J.A. vol. 2 at 91 (requesting redetermination), 65–66 (unfavorable decision on redetermination), 61 (requesting reconsideration), 4 (stating that the decision on reconsideration was unfavorable), 228–229 (requesting ALJ review), 31–37 (unfavorable ALJ decision), 12 (requesting Council review), 3–11 (unfavorable Council decision); J.A. vol. 3 at 99 (requesting redetermination), 78–80 (unfavorable decision on redetermination), 74 (requesting reconsideration), 4 (stating that the decision on reconsideration was unfavorable), 221–22 (requesting ALJ review), 36–46 (unfavorable ALJ decision), 13 (requesting Council review), 3–12 (unfavorable Council decision).

11; J.A. vol. 3 at 3–12.  In each decision, the Council concluded that "the record indicates that the MAC used an amount—either an MSRP or the wholesale cost—that was not the appropriate price information for purposes of calculating the gap-filled payment amount for the [Relizorb] cartridges at issue in accordance with the regulations."  J.A. vol. 1 at 8 (citing 42 C.F.R. § 414.112(c)(1)); J.A. vol. 2 at 8 (same); J.A. vol. 3 at 8–9 (same).  However, the Council nonetheless declined to order additional payment because it concluded that the beneficiaries had "not provided sufficient evidence" to "show that the retail price for a [Relizorb] cartridge was more than the $49 amount used by the MAC in this case."  J.A. vol. 1 at 8; J.A. vol. 2 at 9; J.A. vol. 3 at 9.  The Council explained that the beneficiary, "as the party seeking additional payment for the claim, has the burden to establish that the payment amount was incorrect," and it concluded that the beneficiaries had "not provided sufficient evidence to meet that burden under the circumstances of this case." J.A. vol. 1 at 8–9 (citing 42 U.S.C. § 1395*l*(e) (Section 1833(e) of the Social Security Act) and 42 C.F.R. § 424.5(a)(6)); J.A. vol. 2 at 9 (same); J.A. vol. 3 at 9 (same).

In each decision, the Council acknowledged that the beneficiaries had put forward some relevant evidence in support of their requests for additional reimbursement payments, but it concluded that this evidence was not sufficiently "verifiable" to support its use in the gap-filling calculation.  J.A. vol. 1 at 9–11; J.A. vol. 2 at 9–11; J.A. vol. 3 at 9–11.  Among the evidence that the Council considered and rejected as insufficient were a set of supplier invoices showing payments from suppliers to Alcresta of $46.79 per cartridge in 2016, gradually increasing to $66 per cartridge in 2019, and a set of data showing payments from private payors to suppliers, ranging from less than $44.43 to as much as $448.14 per cartridge.  J.A. vol. 1 at 9–10; J.A. vol. 2 at 10; J.A. vol. 3 at 10.  The Council noted that the beneficiaries had not explained the source of the

17

claims data and had not relied on or referenced the supplier data in support of their request for the Council's review. J.A. vol. 1 at 10; J.A. vol. 2 at 10; J.A. vol. 3 at 10–11.

The Plaintiffs then filed this action, in which they challenge the Council's payment determination as unlawful on four grounds. First, the Plaintiffs allege that the payment decisions are contrary to law because, by using the purported "MSRP" figure from Alcresta's HCPCS application as the starting point for the payment calculation, CMS failed to apply the correct gap-filling methodology. Compl. ¶¶ 121–30. Second, the Plaintiffs allege that the payment decisions are arbitrary and capricious because they fail to account for important supplier costs, rest on contradictory instructions from CMS to its contractors, and are not adequately explained by the Council's written decisions. *Id.* ¶¶ 131–40. Third, the Plaintiffs allege that the payment decisions are not supported by substantial evidence because the purported "MSRP" figure did not support the conclusion that $49 per cartridge was a reasonable charge for Relizorb. *Id.* ¶¶ 141–44. Fourth, the Plaintiffs allege that the payment decisions amount to improper changes in the substantive legal standards governing benefits and payment for enteral nutrition therapy and effectively deny coverage for Relizorb without observing the procedures required by law. *Id.* ¶¶ 145–56.

The Plaintiffs allege that there are approximately 140 Medicare beneficiaries who receive Relizorb and have pending or soon-to-be-filed reimbursement appeals similar to those at issue in this case. Compl. ¶ 3. Several of these other beneficiaries are plaintiffs in recently filed related cases that are stayed pending the outcome of this case. *See, e.g.*, *Gallegos v. Kennedy*, No. 25-cv-3834 (D.D.C. filed Jan. 6, 2026); *Lawrenson v. Kennedy*, No. 25-cv-4477 (D.D.C. filed Dec. 22, 2025); *Faber v. Kennedy*, No. 26-cv-0476 (D.D.C. filed Feb. 13, 2026); *Quinlan v. Kennedy*, No. 26-cv-1493 (D.D.C filed Apr. 29, 2026); *Lowell v. Kennedy*, No. 26-cv-2435 (D.D.C. filed July 13, 2026).

The parties in this case have now filed motions for summary judgment, incorporating by reference the arguments in support of the motions for summary judgment in the related case of *Henry v. Azar* ("*Henry II*"), No. 21-cv-0747 (D.D.C. filed Mar. 22, 2021).  The parties' motions are ripe for decision.

## II. LEGAL STANDARD

A court must grant a motion for summary judgment under Rule 56 if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Judicial review of Medicare reimbursement decisions proceeds according to the standards of the Administrative Procedure Act.  When a party seeks such review, "[t]he entire case on review is a question of law, and only a question of law," because the court's function is to determine, as a matter of law, whether "the evidence in the administrative record permitted the agency to make the decision it did."  *HealthAlliance Hosps., Inc. v. Azar*, 346 F. Supp. 3d 43, 54 (D.D.C. 2018) (KBJ) (first quoting *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); and then quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (JDB)). To make this determination, the court must "review the administrative record to determine whether the agency's decision was arbitrary and capricious, and whether its findings were based on substantial evidence."  *New LifeCare Hosps. of N. Carolina, LLC v. Becerra*, 7 F.4th 1215, 1222 (D.C. Cir. 2021) (quoting *Forsyth Mem'l Hosp., Inc. v. Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011)).

When deciding whether an agency's action was arbitrary and capricious, a reviewing court must "ask whether the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  *New LifeCare*, 7 F.4th at 1222 (alterations in original) (quoting *Motor Vehicle Ass'n v.*

19

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The scope of a court's review under this standard is "narrow," and "a court is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Accordingly, even if a reviewing court is of the opinion that "other policies might better further the Secretary's stated objectives," the court is "compelled to accept the policies and rules adopted by the Secretary so long as they have a rational basis, are reasonably interpreted, and are consistent with the underlying statute."  *Sentara-Hampton Gen. Hosp. v. Sullivan*, 980 F.2d 749, 755 (D.C. Cir. 1992).

The "substantial evidence" standard of review is "highly deferential to the agency fact-finder, requiring only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008) (Kavanaugh, J.) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  "An agency conclusion 'may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view.'"  *Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 174 F.4th 169, 178 (D.C. Cir. 2026) (quoting *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994)).

## III. ANALYSIS

### A.      The Plaintiffs have Article III standing.

The Court begins, as always, with the question of jurisdiction, which requires the Court to decide whether the Plaintiffs have Article III standing.  *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 94–95 (1998).  To have standing—that is, the requisite "personal stake" in the outcome of a case—a party must show an "injury in fact that is concrete, particularized, and actual or imminent," that this injury "was likely caused by the defendant," and that it "would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

20

Although the parties have not focused on the exact basis for the Plaintiffs' standing in their briefing, there is no dispute that the requirements for standing are satisfied in this case. *See generally* Defs.' Mem. In brief, each Plaintiff asserts a cognizable injury resulting from the Council's decision not to reimburse suppliers of Relizorb at a higher rate. *See* Compl. ¶ 115; Pls.' Mem. at 1–2. For Alcresta, the relevant harm is the pocketbook effect of Medicare's reimbursement decision on Alcresta's ability to sell Relizorb to Medicare suppliers at its preferred price, which indirectly depends on the amount that the suppliers receive from Medicare when they supply Relizorb to beneficiaries. *See* Compl. ¶ 115; *Diamond Alternative Energy, LLC v. EPA*, 606 U.S. 100, 120 (2025) (recognizing that "commonsense economic inferences" about an action's indirect effects can support standing). For the Plaintiffs who are Medicare beneficiaries, the relevant harms are alleged violations of procedural rights that protect the beneficiaries' underlying substantive entitlement to Medicare coverage of reasonable and necessary medical treatment. *See* Compl. ¶ 115; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992) (recognizing that a party may have standing to "enforce procedural rights" that "are designed to protect some threatened concrete interest").

Accordingly, the Court is satisfied that the Plaintiffs' asserted injuries demonstrate the requisite "personal stake" in the outcome of this case to establish Article III standing and support the exercise of this Court's subject-matter jurisdiction. *See TransUnion*, 594 U.S. at 423.

**B.    Because Alcresta and the Plaintiffs who are Medicare beneficiaries present the same claims, the Court need not decide whether Alcresta is a proper party.**

The Court next considers whether each of the Plaintiffs' claims falls within the limited set of payment claims for which judicial review is available under the Medicare statute. *See* 42 U.S.C. §§ 405(g) (providing for judicial review of a "final decision of the [Secretary] made after a hearing"), 405(h) (channeling most Medicare claims through the administrative review process),

21

1395ff(b)(1)(A) (providing that judicial review of reimbursement decisions is "as is provided in" § 405(g)).   With limited exceptions, such claims must proceed through each step of Medicare's four-level administrative appeals process before they may be precented for judicial review.  *See Row 1 Inc. v. Becerra*, 92 F.4th 1138, 1142 (D.C. Cir. 2024)*, cert. denied*, 145 S. Ct. 413 (2024).

There is no doubt that the Plaintiffs who are Medicare beneficiaries have exhausted the required administrative appeals process, culminating in an unfavorable decision from the Medicare Appeals Council.  *See supra* note 15; *see also* 42 C.F.R. § 405.906(a)(1) (providing that a "beneficiary who . . . has had a claim for payment filed on his or her behalf" is a party to an initial determination).   Accordingly, these Plaintiffs are entitled to judicial review of the Council's decision.  *See* 42 U.S.C. § 405(g).

The parties have not addressed whether Alcresta has also satisfied the requirements for judicial review.  There is reason to think that it has not done so: Alcresta was not a party to the Council decisions that are under review, and because it is a manufacturer rather than a supplier, it does not appear to be entitled to be a party to the initial determination or to the beneficiaries' appeals.  *See* J.A. vol. 1 at 3; J.A. vol. 2 at 3; J.A. vol. 3 at 3; 42 C.F.R. §§ 405.906(a) (listing the parties to an initial determination, which may include a "beneficiary" or a "supplier"), 405.912(b) (providing that "[a]n individual or entity who is not a provider or supplier may not be an assignee" of appeal rights); *see also Alcresta III*, 755 F. App'x at 7 (Katsas. J, dissenting) ("To be sure, Alcresta, as a manufacturer of medical equipment, cannot itself present or exhaust payment claims within the Medicare channeling scheme." (citing 42 C.F.R. § 405.906(a))).

Nonetheless, because the Defendants have not moved to dismiss Alcresta, and because all Plaintiffs present the same legal challenges to the Council's decisions and seek the same relief, the Court can resolve the parties' motions on the merits, without deciding whether Alcresta is a proper

party. *See M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021) (assuming—though not deciding—that "the rule that if many plaintiffs seek the same relief and at least one of them has Article III standing, the court need not determine whether others also do," extends to "the determination of statutory jurisdiction as well as Article III standing").

### C.    The Council's decisions were consistent with the existing gap-filling rules.

Turning to the merits, the Court begins with the Plaintiffs' arguments that the Council improperly upheld gap-filling calculations that "used the wrong starting point," that the Council "failed to apply [the agency's] gap-filling methodology as required by the statute and regulations," and that it "effectively altered the gap filling rules without following required procedures and without providing fair notice of the change." Pls.' Mem. at 5, 9. For the reasons that follow, the Court rejects these arguments and concludes that the Council's decisions were consistent with existing gap-filling rules.

1.    The Council correctly applied the gap-filling rules when it concluded that the purported MSRP figure stated in Alcresta's initial HCPCS application was not the correct gap-filling amount.

The strongest evidence that the Council faithfully applied the gap-filling rules in this case is that, contrary to the Plaintiffs' allegations, the Council did not "uphold" the contractors' apparently erroneous gap-filling calculations. *Cf.* Pls.' Mem. at 3–4, 9. Instead, in each of the decisions under review, the Council concluded that the Medicare contractors' initial payment calculations had relied on a $49-per-cartridge figure from Alcresta's initial HCPCS coding application that "was not the appropriate price information for purposes of calculating the gap-filled payment amount . . . in accordance with the regulations." J.A. vol. 1 at 8 (citing 42 C.F.R. § 414.112(c)(1)); J.A. vol. 2 at 8 (same); J.A. vol. 3 at 8–9 (same).

The Council identified three persuasive reasons why the $49-per-cartridge figure from Alcresta's HCPCS application was not appropriate for use in the gap-filling calculation. (As

23

explained above, *supra* Section I.C, Alcresta provided this figure in response to a question that called for the "MSRP" or "list price" of Relizorb, but Alcresta stated in the body of its response that the figure represented the "wholesale acquisition cost" of the device. *See* HCPCS Application Ex. at 11.)

*First*, the gap-filling regulation calls for the use of "retail" prices, but Alcresta identified the $49-per-cartridge figure as a "wholesale acquisition cost." J.A. vol. 1 at 8; J.A. vol. 2 at 8; J.A. vol. 3 at 8.

*Second*, even if the contractor disregarded Alcresta's description of the figure as a "wholesale" cost and treated it as an "MSRP," the figure would still be unsuitable for use in the gap-filling calculation because CMS considers MSRPs to be unreliable as evidence of commercial pricing. J.A. vol. 1 at 8 (citing 84 Fed. Reg. 60648, 60730, 60739 (Nov. 8, 2019) (explaining CMS's concern that MSRPs "often are inflated and do not reflect commercial competitive pricing" and therefore may not be "a valid and reliable proxy for supplier charges or market prices")); J.A. vol. 2 at 8 (same); J.A. vol. 3 at 8 (same). Although the Council noted that the typical concern with reported MSRPs—that they may be "inflated" relative to actual commercial prices—does not appear to apply under the circumstances presented here, it correctly explained that CMS has disapproved of the use of MSRPs in the gap-filling calculation when other, more reliable pricing information is available. *See* J.A. vol. 1 at 8; J.A. vol. 2 at 8 (same); J.A. vol. 3 at 8 (same).

*Third*, even if the contractors had interpreted the $49-per-month figure as a "wholesale" price and used that price to calculate the gap-filling amount, the contractors should have applied a markup to estimate the retail price rather than using the wholesale price itself in their calculations. J.A. vol. 1 at 8 (citing 84 Fed. Reg. at 60730 (explaining a former practice of using "wholesale

prices plus a markup percentage to convert the prices to retail prices" to gap-fill fee schedules));
J.A. vol. 2 at 8 (same); J.A. vol. 3 at 8 (same).

Having identified each of these problems with the contractors' gap-filling calculations, the
Council clearly did not "uphold" those calculations. *Contra* Pls.' Mem. at 3–4, 9. Instead, the
Council denied the beneficiaries' requests for additional reimbursement payments on the
alternative ground that the beneficiaries had not introduced sufficient evidence to support their
requests for additional payment. J.A. vol. 1 at 8–9; J.A. vol. 2 at 9; J.A. vol. 3 at 9; *see also infra*
Section III.D (analyzing the Council's conclusion on this point). Because the Council's decisions
did not rest on the conclusion that the contractors had correctly applied the relevant gap-filling
rules, the Court rejects the Plaintiffs' argument that the Council contravened the APA by upholding
an "admittedly invalid gap-filling calculation." *See* Pls.' Mem. at 9.

> 2.      The Council correctly concluded that the gap-filling rules do not require payment based on the amount billed to Medicare for the claims at issue.

The Plaintiffs next argue that the Council erred by declining to order a gap-filled payment
based on "reasonable charges." *See* Pls.' Mem. at 4. Although the Plaintiffs do not specifically
identify in their briefing the sums that they contend are "reasonable charges," the three individual
Plaintiffs argued to the Council that the gap-filled payments should have been based on "the
amount actually billed by the supplier" for the claims at issue. *See* J.A. vol. 1 at 12 ($11,340, or
$378 per cartridge, as to Mr. Mayo); J.A. vol. 2 at 13 (same, as to Ms. Goetter); J.A. vol. 3 at 14
($24,721.20, or $412.02 per cartridge, as to Ms. Muhammad-Solomon). Alcresta and another
Medicare beneficiary presented a similar argument in the related case of *Henry v. Azar*
("*Henry II*"), No. 21-cv-0747 (D.D.C. filed Mar. 22, 2021). *See* Pls.' Mem., No. 21-cv-0747, Dkt.
No. 9 (arguing that the suppliers' charges of $8,398.80, or $139.98 per cartridge, were the relevant
"reasonable charges").

25

The Court agrees with the Council that the gap-filling rules do not require payment to be based on the amount that a supplier bills to Medicare for the claim at issue. *See* J.A. vol. 1 at 7, 9; J.A. vol. 2 at 7, 9; J.A. vol. 3 at 7, 9. As the Council correctly concluded, Medicare reimburses claims based on actual charges only when the charged amount is less than the calculated fee-schedule amount. *See* J.A. vol. 1 at 9 (citing 42 C.F.R. § 414.102(a)); J.A. vol. 2 at 9 (same); J.A. vol. 3 at 9 (same). When there is no established fee-schedule amount, the actual charges are relevant only to the extent that they inform the gap-filling calculation by providing "verifiable" information regarding "commercial pricing for the item." *See* 42 C.F.R. § 414.112(c)(1).

In this case, the Council reasonably concluded that the charged amounts should not be used as the starting points for the gap-filling calculation because they were not "verifiable" evidence of commercial pricing. J.A. vol. 1 at 9; J.A. vol. 2 at 9; J.A. vol 3 at 9. This conclusion is consistent with CMS's disapproval of certain other potential sources of gap-filling pricing information, including MSRPs, on the grounds that they "do not reflect commercial competitive pricing" and cannot be "independently substantiated." *See* 84 Fed. Reg. at 60730.

The Court need not decide whether actual charges might sometimes be sufficiently "verifiable" evidence of commercial pricing to warrant their use in the gap-filling calculation. *See* 42 C.F.R. § 414.112(c)(1). For present purposes, it is sufficient to hold that the Council was not *required* to use these charges to calculate the gap-filling amounts in this case and that, on the record presented here, its decision not to do so was reasonable. On these grounds, the Council's decisions not to use the amount billed to Medicare in the gap-filling calculation were consistent with the relevant gap-filling rules.

3.     The Council correctly concluded that the beneficiary or supplier has the burden of producing verifiable price information for use in the gap-filling calculation.

Finally, the Council did not err by concluding that the beneficiaries had the burden of producing sufficient evidence to inform the gap-filling calculation.  As the Council correctly explained, the party seeking payment from Medicare must "furnish sufficient information" to allow CMS to "determine the amount of payment" allowed under the governing reimbursement rules, including the gap-filling rules.  J.A. vol. 1 at 8–9 (citing 42 C.F.R. § 424.5(a)(6)); *see also* 42 U.S.C. § 1395*l*(e); J.A. vol. 2 at 9; J.A. vol. 3 at 9.  The Council correctly stated this aspect of the gap-filling rules in each of the decisions under review, and the Plaintiffs do not argue otherwise. *See generally* Pls.' Mem.

In sum, the Council correctly applied CMS's existing gap-filling methodology in each of the decisions under review.  By faithfully applying that methodology, the Council concluded that the contractors had apparently erred by using a $49-per-catridge figure from Alcresta's initial HCPCS coding application as the starting point for their calculations, but the Council reasonably and appropriately declined to order payment based on the amounts billed to Medicare and concluded that the beneficiaries had the burden of producing sufficient evidence to support the greater payment amounts they requested.  Each of these decisions was reasonable, supported by the record, and consistent with the relevant legal standards.

**D.     The Council's conclusions that the Plaintiffs did not produce verifiable price information to support their claims were supported by substantial evidence and were not arbitrary and capricious.**

Having concluded that the Council correctly applied the relevant gap-filling methodology, the Court next reviews the Council's substantive conclusion that the Plaintiffs failed to provide sufficient information to show that they were entitled to additional payment.  Because the

27

Council's decisions on this point were supported by substantial evidence and were not arbitrary and capricious, the Court shall not disturb its decisions.

As explained above, *supra* Section I.B.2, the Medicare regulations and Claims Processing Manual identify the sources of price information that may be used in the gap-filling information, beginning with "supplier price lists, including catalogs and other retail price lists (such as internet retail prices) that provide information on commercial pricing for the item."[16]  CMS has explained that it uses supplier price lists in the gap-filling calculation because they "provide the best estimate of what suppliers would have routinely charged" during the fee-schedule base year.[17]  Other permissible sources of pricing information include "payments made by Medicare Advantage" and "verifiable information from supplier invoices and non-Medicare payer data."[18]

The Plaintiffs argue that the beneficiaries' submissions in the administrative appeals process "contained substantial data on commercial pricing and actual private payor reimbursement amounts" and that the Council should have used this information to calculate greater gap-filled payment amounts.  Pls.' Mem. at 7–8.  The data that the Plaintiffs submitted included both supplier invoices and records of payments from private payors to suppliers.  J.A. vol. 1 at 9–10; J.A. vol. 2 at 10; J.A. vol. 3 at 10.    However, as the Council noted, the beneficiaries did not submit "*any* supplier price list information*," which is the primary source of pricing information identified in the relevant gap-filling rules.  J.A. vol. 1 at 9; J.A. vol. 2 at 9; J.A. vol. 3 at 9.  The Council considered that omission significant, in part because CMS considers supplier price lists to be the

---

[16] 42 U.S.C. § 414.112(c)(1); *see also* Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3 (rev. Dec. 4, 2020; Dec. 2, 2021; and Dec. 2, 2022).

[17] 84 Fed. Reg. at 60734.

[18] *See* 42 C.F.R. § 414.122(c)(1); Medicare Claims Processing Manual, CMS Pub. No. 100-04, ch. 23, § 60.3 (rev. Dec. 4, 2020; Dec. 2, 2021; and Dec. 2, 2022).

28

"best evidence" of what commercial pricing would have been in the relevant base year.  J.A. vol. 1 at 9 (quoting 84 Fed. Reg. at 60734); J.A. vol. 2 at 9 (same); J.A. vol. 3 at 9–10 (same).

The Council's decisions not to approve greater payment amounts based on the Plaintiffs' submitted data were reasonable and supported by substantial evidence.  The Plaintiffs argue that the Council should have approved greater payment amounts because the beneficiaries submitted data showing that "virtually all private payors" made payments for Relizorb that "substantially exceed Medicare's payment amounts."  Pls.' Mem. at 8.  But the Council reasonably determined that this data was not sufficiently "verifiable" to support its use in the payment calculation because the private payor data was "incomplete" and the record "does not explain how the [included] claims were identified and compiled, the methodology or criteria used to select the data, or who was responsible for making the associated payment decisions."  J.A. vol. 1 at 10; J.A. vol. 2 at 10; J.A. vol. 3 at 10.  The Plaintiffs also object to the Council's references to supplier invoices from 2016 through 2019, arguing that these invoices reflect only supplier acquisition costs, not the cost of providing Relizorb to beneficiaries.  *See* Pls.' Mem. at 8–9.  But the Council clearly understood and considered this limitation of pricing information drawn from supplier invoices, noting that these invoices did not reflect "the additional cost associated with furnishing the item to a beneficiary."  J.A. vol. 1 at 10; J.A. vol. 2 at 10; J.A. vol. 3 at 10.  In short, the Council's decisions accurately describe the evidence in the record and show that the Council clearly understood the nature and limitations of that evidence.  Ultimately, the Council drew reasonable conclusions from the relevant evidence.  On this record, the Court cannot say that the Council's decisions were arbitrary and capricious or otherwise unlawful.

Finally, although the Council could have remanded the beneficiaries' claims to ALJs to allow the introduction of additional pricing evidence, it was not required to do so, and the Council's

decisions to adopt the ALJ's conclusions without remand were not arbitrary and capricious.  *See* 42 C.F.R. § 405.1126 (providing that "the Council may remand a case in which additional evidence is needed").  As the Council correctly noted, the beneficiaries were represented in their appeals by counsel—the same counsel representing them in this case—and they had ample opportunity to introduce supplier price lists and other verifiable commercial pricing information at earlier stages of the proceedings.  *See* J.A. vol. 1 at 9–11; J.A. vol. 2 at 9–11; J.A. vol. 3 at 9–11.  Under these circumstances, the Council acted within its authority by adopting the ALJ's decisions without remanding for further proceedings.

> **E.  The reimbursement rates that the Council upheld do not effectively deny coverage for Relizorb, alter or amend national coverage determinations, or contravene the D.C. Circuit's prior holding that Alcresta is entitled to an "opportunity" to seek meaningful reimbursement.**

Alongside their challenges to the Council's application of procedural rules, the Plaintiffs argue that the reimbursement amounts that the Council upheld in the cases under review were substantively so low that they effectively denied coverage of Relizorb and contravened a previous holding of the D.C. Circuit.  *See* Pls.' Mem. at 9–10.  These arguments are unavailing.

First, the Plaintiffs argue that the reimbursement rates resulting from the Council's decisions are "economically unsustainable," but they have not identified any information in the record that is sufficient to support this conclusion.  *See* Pls.' Mem. at 10.  Although the Plaintiffs contend that the approved reimbursement rates are less than the price that suppliers currently pay Alcresta to acquire Relizorb, the Plaintiffs have not introduced any evidence showing that it would be unsustainable for Alcresta to alleviate this pressure on suppliers by adjusting its wholesale prices.  *See id.*  For example, the Plaintiffs have not introduced evidence showing that Alcresta's cost to manufacture and distribute Relizorb exceeds the reimbursement rates at issue.  *See id.*  In the absence of that kind of cost information, the Court cannot say that the approved reimbursement

30

rate has effectively denied coverage for the device.  The Court therefore rejects the Plaintiffs' arguments that CMS has violated the Medicare statute by improperly denying coverage for a medically necessary device.  *See* Pls.' Mem. at 10.

The Plaintiffs next argue that the approved reimbursement rates amount to the constructive adoption or amendment of national coverage determinations without adherence to proper procedures, but this argument fares no better than their related arguments about constructive denial of coverage.  *See* Pls.' Mem. at 10.  As this Court has previously held, a Medicare beneficiary cannot successfully challenge a payment decision as an improper national coverage determination because the Medicare statute expressly provides that such a determination "does not include . . . a determination with respect to the amount of payment made for a particular item or service." *Henry I*, 518 F. Supp. 3d at 528 (quoting 42 U.S.C. § 1395ff(f)(1)(B)); *see also id.* at 527 (concluding that Alcresta cannot bring such a challenge because, under 42 U.S.C. § 1395ff(f)(5), only a beneficiary may challenge a national coverage determination).

Finally, the Plaintiffs contend that the reimbursement amounts approved in this case contravened an earlier mandate of the D.C. Circuit.  *See* Pls.' Mem. at 10.  This argument is without merit.  In the decision on which the Plaintiffs rely for this argument, the D.C. Circuit concluded that Alcresta was entitled to a unique, unencumbered billing code for Relizorb in part because the absence of such a code served "as an absolute barrier to meaningful reimbursement." *Alcresta III*, 755 F. App'x at 5.  But critically, the D.C. Circuit did not order the Secretary to *reimburse* separate claims for Relizorb in any amount, let alone to reimburse claims at a specific rate.  *See id.*  On the contrary, the D.C. Circuit noted that it was "unclear" whether the Secretary would decide to reimburse suppliers separately for Relizorb once the device received a unique billing code, but that Alcresta was entitled to an "opportunity" to seek such payments.  *Id.* at 4–5.

31

In sum, although there may be powerful arguments in favor of a higher reimbursement rate for Relizorb, the rate that the Council approved in this case did not effectively deny coverage for the device, unlawfully alter or amend a national coverage determination, or contravene the D.C. Circuit's directive to provide an "opportunity" to request meaningful reimbursement.

*        *        *

Relizorb is, by all indications in the record, a remarkable product that makes a positive difference in the lives of the patients who depend upon it. Ever since the device received FDA clearance more than a decade ago, Alcresta has vigorously pursued a sustainable level of reimbursement for it, which would help ensure that Medicare beneficiaries can continue to use the device to help improve their health.

In this case, the Medicare Appeals Council correctly applied the governing reimbursement methodology and reasonably concluded that the verifiable evidence in the record did not support a greater reimbursement amount for the three specific Relizorb claims under review. Because the Council's resolution of the issues presented to it was not contrary to law or arbitrary and capricious, was supported by substantial evidence, and does not amount to a change in the governing standards, the Court shall **GRANT** the Defendant's [12] Motion for Summary Judgment and **DENY** the Plaintiffs' [13] Motion for Summary Judgment.

However, the outcome of this case does not preclude Medicare beneficiaries or suppliers from pursuing greater reimbursement payments for Relizorb in future cases. In the decisions under review, the Council agreed with the beneficiaries that the purported MSRP that the Medicare contractors used as the starting point for their payment calculations "was not the appropriate price information for purposes of calculating the gap-filled payment amount." J.A. vol. 1 at 8 (citing 42 C.F.R. § 414.112(c)(1)); J.A. vol. 2 at 8 (same); J.A. vol. 3 at 8–9 (same). As the Court has

32

explained, the Council's reasoning on this point was sound and consistent with the relevant gap-filling rules. In future reimbursement cases, beneficiaries and suppliers remain free to argue that a different amount should be used in the gap-filling calculation. If the beneficiaries and suppliers support their future reimbursement requests with sufficient pricing data that is verifiable, CMS could reasonably decide that their claims for Relizorb should be reimbursed at a higher rate.

### IV. CONCLUSION

For the foregoing reasons, the Court shall **GRANT** the Defendant's [12] Motion for Summary Judgment and **DENY** the Plaintiffs' [13] Motion for Summary Judgment.

An appropriate Order accompanies this Memorandum Opinion.

**Dated:** August 5, 2026

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge